**BULLITT FISCAL COURT, Bullitt County, Appellants Kentucky; City of Shepherdsville; City of Mount Washington; City of Hillview; City of Lebanon Junction; City of Pioneer Village; City of Hebron Estates; City of Hunters Hollow; and City of Fox Chase**

v.

**BULLITT COUNTY BOARD OF HEALTH, Appellee.**

No. 2013–SC–000023–DG.

Supreme Court of Kentucky.

June 19, 2014.

John E. Spainhour, Jr., Monica Meredith Robinson, Tammy Renee Baker, for appellant, Bullitt Fiscal Court, Bullitt County, Kentucky.

Joseph Wantland, for appellant, City of Shepherdsville.

Norman Richard Lemme, Matthew R. Lemme, for appellant, City of Mount Washington.

Mark Edward Edison, for appellants, City of Hillview; City of Lebanon Junction; City of Pioneer Village; City of Hebron Estates; City of Hunters Hollow; City of Fox Chase.

Phillip D. Scott, Jason Trent Ams, for appellee.

Michael Jay O'Hara, for amicus curiae, American Cancer Society; The American Cancer Society Cancer Action Network; The American Heart Association; American Lung Association; American Lung Association of the Midland States; American for Nonsmokers' Rights; Campaign for Tobacco–Free Kids; The National Association of County and City Health Officials; The National of Local Boards of Health; Foundation for A Healthy America; Kentucky Health Departments Association;

Kentucky Public Health Association; Kentucky Medical Association; Kentucky Nurses Association; Tobacco Control Legal Consortium.

Alan Jerome George, for amicus curiae, Clark County Board of Health; Madison County Board of Health; Woodford County Board of Health.

Opinion of the Court by Justice CUNNINGHAM.

"Tobacco is a nasty weed," allegedly spoke King James I of England in 1604 while in a rather lyrical mood. "Right from the hell they brought the seed. It fouls the mouth and soils the clothes and makes a chimney of the nose."

### Historical Background

Little could King James have envisioned what a dynamic course his "weed" would take over the next four hundred years in America. No state has been more affected by tobacco than Kentucky. From the burley of the central region of the state to the dark tobacco of the far west, Kentucky's relationship with its historic cash crop has been bittersweet—both the boon and the bane of our Commonwealth.

Spanning Pikeville to Paducah, rare is the hill, hollow, or hamlet that remains untouched by the legacy of this controversial plant. For example, images of tobacco leaves are molded into the façade of the Caldwell County Courthouse in Princeton, Kentucky as an enduring testament to our agrarian history and culture. Further illustration may be gleaned from the large quilt that hangs on the first floor of our state Capitol building. It has been woven together with 120 sections representing the individual identities of each of our Kentucky counties. More than a dozen of these quilted sections have tobacco plants artistically stitched upon them. These examples are representative of the undeniable impact of tobacco on Kentucky's economic, social, and political history.

It is doubtful that anyone has ever seriously challenged the ancient admonition of King James to suggest that any type of consumption of tobacco is good for one's health. But there are many things that fall upon that list of unhealthy habits of which Americans are still free to indulge. In fact, a notion that has been a large part of the American culture throughout much of its history is the belief that freedom includes the right to be wrong. Renowned 19th century physician and educator, Thomas H. Huxley, stated the opinion of many when he professed, "It is far better for a man to go wrong in freedom than go right in chains." That belief is tempered, of course, with the condition that the harmful practice does not invade the well-being of others. Nowhere in America has that independent streak existed with greater fervor than in Kentucky. For example, Kentucky was one of the last states to adopt a secondary seatbelt law and to later implement a primary seatbelt law. *See* KRS 189.125.

### Smoking Statistics

The two largest tobacco-producing states are Kentucky and North Carolina, accounting for 75% of tobacco grown in the United States in 2012.[1] Although North Carolina produces more tobacco than Kentucky, the Commonwealth is home to more than twice as many tobacco farms as North Carolina.[2] Cash receipts from Kentucky's tobacco production totaled

---

1. *U.S. Census of Agriculture*, 2012, Geographic Area Series: Selected Crops Harvested: 2012 (Table 24) (AC–12–A–51) pp. 412–19, *available at* http://www.agcensus.usda.gov/ Publications/2012/Full_Report/Volume_1,_Chapter_1_US/usvl.pdf.

2. *Id.*

$384,886,000 in 2012—approximately 7.3% of the Commonwealth's total agricultural commodity cash receipts that year.[3] This is a substantial economic impact.

Kentucky also leads the nation in smoking prevalence. The Centers for Disease Control and Prevention ("CDC") cites that, in 2012, 28.3% of Kentucky adults were classified as current smokers.[4] This statistic slightly decreased from 29% in 2011, where the CDC listed Kentucky as having the highest rate of adult smokers in the country.[5] Kentucky spends in excess of $1.5 billion in annual health care costs directly related to smoking, $487 million of which is allocated to Medicaid.[6] Yet, nearly 8,000 Kentucky adults die from smoking related illnesses each year.[7] This is an astonishing health impact.

In 1964, the U.S. Surgeon General released a report concluding that "cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate."[8] This report was the first significant attempt at raising awareness of the health issues now commonly associated with smoking, such as the increased risk of lung cancer. Furthermore, in reports throughout the 1980s, then Surgeon General C. Everett Koop famously heralded the negative health consequences of smoking.

More germane to the case before us, subsequent surgeons general reports and other scientific literature have also voluminously documented the harmful effects of tobacco smoke on non-smokers, commonly known as second-hand smoke. A 2006 Surgeon General's Report cites that many of the chemicals inhaled through second-hand smoke are known carcinogens.[9] Further, a 2010 Surgeon General's Report concluded that even short-term exposure to second-hand smoke can result in serious health consequences.[10] In 2009–2010, overall second-hand smoke exposure by Kentucky adults was 51.4%, with 30% reporting exposure in the workplace and 32.8% reporting exposure in public

3. U.S. Dep't of Agriculture, Economic Research Service, *Farm Income and Wealth Statistics: Annual Cash Receipts by State:* Kentucky, *available at* http://ers.usda.gov/data-products/farm-income-and-wealth-statistics/annual-cash-receipts-by-commodity.aspx# P85907913d41f4f7b97db 7113baf#1F8e9b1_2_22iT0T0R0x17 (last updated Feb. 11, 2014).

4. CDC.gov, Kentucky 2012 Tobacco Use, http://apps.nccd.cdc.gov/brfss/display.asp? cat=TU & yr=2012 & qkey=8161 & state=KY (last visited May 20, 2014).

5. CDC.gov, Kentucky 2011 Tobacco Use, http://www.cdc.gov/tobacco/data_statistics/state_data/state_highlights/2012/states/kentucky/index.htm (last visited May 20, 2014).

6. Tobacco-freekids.org, The Toll of Tobacco in Kentucky, http://www.tobaccofreekids.org/facts_issues/toll_us/kentucky (last visited May 20, 2014).

7. *Id.*

8. U.S. Dep't of Health, Education, and Welfare, *U.S. Surgeon General's Advisory Committee, Smoking and Health* (1964) p. 31.

9. U.S. Dep't of Health and Human Services, *The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General,* (2006) p. 12, *available at* http://www.ncbi.nlm.nih.gov/books/NBK44324/pdf/TOC.pdf.

10. U.S. Dep't of Health and Human Services, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease,* (2010) p. 9; *see also* Overview of Key Findings from the 2010 Report, *available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2010/index.htm?s_cid=cs_1843.

places.[11]

Given such dismal data, it is understandable that many health care professionals and government officials have sought to curtail the prevalence of this noxious fume. Promoting a smoke-free society is a reasonable goal grounded in sound research. However, when promotion becomes enactment, even the most virtuous causes must also be grounded in law. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (recognizing that "no matter how important, conspicuous, and controversial the issue ... an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority....").

### Regulation No. 10–01

On March 22, 2011, the Bullitt County Board of Health (the "Board") enacted Regulation 10–01 (the "Regulation") entitled, "A Regulation Related to the Protection of the Public Health and Welfare by Regulating Smoking in Public Places and Places of Employment." This eleven-page document begins by citing various studies and articles discussing the hazards of tobacco smoke, primarily second-hand smoke. Section 4 of the Regulation prohibits tobacco smoke in "all enclosed public places within Bullitt County," specifically including bars, bingo facilities, hotels, motels, and restaurants.

The subsequent sections of the Regulation prohibit smoking in enclosed places of employment, in certain outdoor public places, and in private clubs. The Regulation does permit smoking in private residences unless they are otherwise defined as "public places." Section 10 of the Regulation requires the posting of "No Smoking" signs and the removal of ashtrays from regulated places. Section 12 requires that the Regulation be enforced through citations issued by the Board, but also provides that enforcement "may be conducted by ... sworn law officers" of Bullitt County. The Regulation additionally requires owners and operators of smoking-regulated businesses to direct anyone they see smoking in violation of the Regulation to cease. If the smoker refuses, the Regulation commands that business owners and operators "shall call local law enforcement."

Section 13 of the Regulation provides penalties, including fines, which shall be assessed by the Board upon finding a violation of the Regulation. Violations by business owners and managers "may serve as reasonable cause for the suspension or revocation of any permit or license." Section 13D further dictates that "[v]iolation of the [R]egulation is declared to be a public nuisance." Section 14 provides that criminal charges must be adjudicated in Bullitt District Court and civil matters must be adjudicated in Bullitt Circuit Court.

### Procedural History

The Bullitt County Fiscal Court and eight cities in Bullitt County (collectively referred to as "Appellants") filed a petition for a declaration of rights against the Board in Bullitt Circuit Court. Appellants argued before the trial court, *inter alia,* that the Board had usurped their authority by enacting a substantive law without proper enabling legislation. Appellants sought a declaration that the Regulation is void and unenforceable and further requested a permanent injunction prohibit-

---

11. CDC.gov, Smoking and Tobacco Use, State Highlights, Kentucky (2012), http://www.cdc.gov/tobacco/data_statistics/state_data/state_ highlights/2012/pdfs/states/kentucky.pdf (last visited May 20, 2014).

ing its enforcement. The trial court agreed and held that the Regulation was invalid.

A divided Court of Appeals panel reversed the trial court's ruling. The court reasoned that the Regulation was a constitutionally valid and otherwise reasonable exercise of the Board's statutory authority under KRS 212.230(1)(c). This Court granted discretionary review. After reviewing the record and the law, we reverse the decision of the Court of Appeals.

### Statutory Interpretation

■ Appellants present several arguments. First, they assert that, by implementing the Regulation, the Board exceeded its authority pursuant to KRS 212.230(1)(c). In the alternative, Appellants argue that KRS 212.230(1)(c) is unconstitutional to the extent it is interpreted to authorize the Board's authority to adopt the Regulation. Lastly, Appellants contend that the Regulation has been preempted by state law. Statutory construction is a matter of law which requires de novo review by this Court. *Hearn v. Commonwealth*, 80 S.W.3d 432, 434 (Ky. 2002) (citing *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth of Kentucky, Transp. Cabinet*, 983 S.W.2d 488 (Ky. 1998)).

### KRS 212.230

Our analysis begins with KRS 212.230(1)(c), which states in pertinent part as follows:

(1) County, city-county, and district boards of health shall:

. . .

(c) Adopt, except as otherwise provided by law, administrative regulations not in conflict with the administrative regulations of the Cabinet for Health and Family Services necessary to protect the health of the people or to effectuate the purposes of this chapter

or any other law relating to public health. . . .

■ In construing statutes, we must give effect to the intent of the General Assembly. *Maynes v. Commonwealth* 361 S.W.3d 922, 924 (Ky.2012). "We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Id.* (citing *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky.2006)). We may also look for guidance from outside sources such as legislative history. *Beshear v. Haydon Bridge Co., Inc.*, 304 S.W.3d 682, 703 (Ky. 2010).

To find sufficient grounding for the Regulation at issue would require this Court to construe KRS 212.230(1)(c) as delegating the totality of the Commonwealth's police power to the health boards. Nothing would remain to be ceded by the General Assembly, including the critical legislative charge of distinguishing virtue from vice. *See Nourse v. City of Russellville*, 257 Ky. 525, 78 S.W.2d 761, 765 (1935) ("Virtues and vices have frequently changed places as life moved on through the ages: witch burning used to be a virtue and lending money at interest a vice."). Such an expansive interpretation of KRS 212.230(1)(c) would promote an overly broad delegation of legislative sovereignty, thereby violating Sections 27 and 28 of our Kentucky Constitution. However, our plain reading of the statute reveals a more narrow result.

■ Although KRS 212.230(1)(c) provides health boards with a general grant to adopt regulations "necessary to protect the health of the people," it does not provide the plenary power to adopt *any* regulation relating to that broad field. KRS 212.230(1)(c) is actually a limited delegation of legislative authority evidenced by

the qualification that health boards may adopt, "except as otherwise provided by law, administrative regulations not in conflict with the administrative regulations of the Cabinet for Health and Family Services." Thus, KRS 212.230(1)(c) generally provides for vigorous health boards, while also reserving the totality of the state's police power in the field of public health. The legislative history of this statute proves instructive.

### Legislative History

KRS 212.230, and its predecessor provisions, enjoys a rich and enduring history. With the enactment of the Kentucky Revised Statutes in 1942, Kentucky Statutes ("KS") 2054a–10, 2054a–15, and 2055 were amended and reclassified as KRS 212.230. However, KS 2055 dates as far back as 1893. *See* Carroll's Kentucky Statutes (1936). The 1942 amendments to KS 2055 retained much of the enabling language that was present in older versions. Under these statutes, the enumerated powers and duties of county health boards focused primarily on the prevention and containment of epidemic and communicable diseases.

In 1954, the language presented in KRS 212.230(1)(c) was added and has not been substantively amended since. In that year, it would have been commonplace for members of the General Assembly to indulge in a cigarette or cigar in their offices, committee rooms, or even on the floors of the House and Senate chambers. Most likely, the KRS 212.230(1)(c) legislation was debated and voted in chambers fogged with a haze of smoke. In fact, smoking was not prohibited in the Capitol building until 2004 and even then only in "public areas." KRS 61.167. The bill that would become KRS 61.167 was approved in the House of Representatives by a vote of 72–15 and in the Senate by a vote of 31–3. Thus, as recent as 2004, there were duly-elected members of the General Assembly voting against the regulation of smoking in their own workplaces.

 It therefore strains credulity that, in 1954, the legislators responsible for KRS 212.230(1)(c) would have intended, or even remotely foreseen, that this statute would be invoked sixty years later by an administrative agency to prohibit smoking in public places. In addition to our plain reading of KRS 212.230(1)(c), the legislative history surrounding this statute similarly fails to provide grounding for the Regulation. Furthermore, "we must be guided to a degree by common sense as to the manner in which [the legislature] is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133, 120 S.Ct. 1291. Nevertheless, we will explore our precedent in search of further clarification.

### Instructive Decisions

The Court of Appeals primarily supports its holding in this case by quoting at length prior decisions by this Court. We believe that the cases cited by the Court of Appeals and further advanced by the Board are distinguishable from the present matter.

The Court of Appeals relied heavily on our decision in *Commonwealth v. Do, Inc.*, 674 S.W.2d 519 (Ky.1984). In that case, this Court approved the Jefferson County Board of Health's regulatory involvement in the prevention of lead paint poisoning in Jefferson County. Our decision was premised primarily on KRS 211.900 et seq., which specifically addressed lead poisoning and expressly authorized and encouraged action at the local level. *See* KRS 211.901(4); KRS 211.901(6). In contrast, there is no similar statutory mandate au-

thorizing the Board to regulate smoking and second-hand smoke in particular.

Notably, the *Do* Court did not rely on KRS 212.230(1)(c). Instead, *Do* briefly discussed KRS 212.350 et seq. as a basis for the health board's general authority. *Do*, 674 S.W.2d at 521. KRS 212.350 is an enabling statute that incorporates provisions similar in breadth and scope to KRS 212.230(1)(c). However, KRS 212.350 and its accompanying provisions apply exclusively to counties containing cities of the first class/consolidated governments, which is limited to Jefferson County.[12] The distinction in the enabling language contained within the two statutes may be inconsequential for much of our analysis. Yet, a closer look at Chapter 212 reveals a decisive distinction. In counties containing cities of the first class, KRS 212.380(1) provides as follows:

> [S]aid board shall be composed of ten (10) members, two (2) of whom shall be the mayor of such city, and the county judge/executive of such county, as members ex officio, and four (4) of whom shall be *appointed by the mayor* of such city and four (4) of whom shall be *appointed by the county judge/executive* of such county with the approval of the fiscal court.

(Emphasis added).

KRS 212.380(1) was originally enacted in 1942 and has been amended several times since. However, for purposes of our analysis, KRS 212.380(1) has consistently provided that health board members in counties regulated under that statute shall be appointed through some type of joint action by the mayor and county judge/executive.

In contrast, the composition of the Board in the present case of Bullitt County is determined by KRS 212.020(1). That provision instructs that health boards shall be composed of a total of twelve members, ten of whom are appointed by the Secretary of the Cabinet for Health and Family Services. KRS 212.020(1). The remaining two members include the county judge/executive and one person appointed by the local fiscal court. *Id.*

Therefore, Jefferson County Health Board members are either locally elected officials or are appointed by locally elected officials. However, in counties such as Bullitt, the substantial majority of health board members are appointed by the Secretary of the Cabinet for Health and Family Services and not by duly elected representatives. When regulating controversial issues traditionally within the province of state or local legislative entities, this structure is constitutionally problematic in that it does not comport with traditional notions of representative government. *Cf. Lexington Fayette County Food and Beverage Ass'n v. Lexington–Fayette Urban County Gov't*, 131 S.W.3d 745 (Ky.2004) (upholding anti-smoking ordinance enacted by the Lexington–Fayette Urban County Council).

Another case cited with much fanfare is *Louisville & Jefferson County Bd. of Health v. Haunz*, 451 S.W.2d 407 (Ky. 1970). In that case, our predecessor Court upheld the Jefferson County Board of Health's administrative regulations requiring minimal standards for habitable housing. *Id.* Similar to *Do*, the regulations in *Haunz* were adopted pursuant to the

---

**12.** Because of the many unique aspects of managing cities of varying populations, the General Assembly has historically assigned each Kentucky city to one of six different classes. *See* Ky. Const. § 156 (repealed); *see* *also* KRS 81.010 (repealed). Effective January 1, 2015, the six-class system will be replaced by a two-class system. *See* 2014 Kentucky Laws Ch. 92 (HB 331).

health board's statutory authority provided by KRS 212.350, not KRS 212.230(1)(c).

In support of its argument in the present case, the Board notes that the enabling language in KRS 212.350 is closely analogous with KRS 212.230(1)(c). By way of import, the Board contends that, under the reasoning advanced in *Haunz*, all health boards possess the "broad authority to promulgate rules and regulations concerning the public health." *Do*, 674 S.W.2d at 521 (citing *Louisville & Jefferson County Bd. of Health v. Haunz*, 451 S.W.2d 407 (Ky.1970)); *see also Do*, 674 S.W.2d at 521 (recognizing that "there is no broader field of police power than that of public health") (citations omitted). Although the Board's argument for this facial application of *Haunz* to the present facts is not without merit, a more thorough analysis of *Haunz* reveals a disparity between its holding and the authority it offers in support thereof.

*Haunz* cites several decisions in support of its holding. *Southeastern Displays, Inc. v. Ward*, 414 S.W.2d 573 (Ky.1967); *Butler v. United Cerebral Palsy of Northern Ky., Inc.*, 352 S.W.2d 203 (Ky.1961); *Baughn v. Gorrell & Riley*, 311 Ky. 537, 224 S.W.2d 436 (1949). In each of these three cases, the Court upheld the constitutionality and validity of various statutes authorizing administrative agencies to promulgate rules and regulations. However, *Ward, Butler*, and *Baughn* involved statutes providing for the regulation of advertising devices along public roads, public aid to private institutions involved in the education of "exceptional children," and the establishment of wage controls, respectively. As such, these cases involved enabling statutes that were much more narrow and definitive of a specific regulatory domain than that provided by KRS 212.230(1)(c). We find the application of these cases to the present matter to be incongruous.

Lastly, the *Haunz* Court relied on *Barnes v. Jacobsen*, 417 S.W.2d 224 (Ky. 1967). That case involved a challenge to the validity of a regulation adopted by the Boone County Board of Health pursuant to KRS 212.230(1)(c). The regulation provided that "no private sewage disposal system should be installed without a permit first having been obtained from the Boone County Health Department." *Id.* at 227. Citing no statutory authority other than KRS 212.230(1)(c), the Court held that the health board properly exercised its authority in adopting the regulation. *Id.* at 227–28.

At first blush, *Barnes* appears to advance the Board's expansive interpretation of KRS 212.230(1)(c). However, a closer inspection reveals that the Court's determination was fortified almost exclusively by a well-established line of cases recognizing the need for strong local control regarding matters of sewage and sewage disposal. *See, e.g., Nourse*, 78 S.W.2d at 765 ("[N]othing contributes more to secure the preservation of public health than a sanitary system of sewage disposal...."); *Sanitation District No. 1 of Jefferson County v. Campbell*, 249 S.W.2d 767, 773 (Ky.1952) (citing *Hutchinson v. City of Valdosta*, 227 U.S. 303, 308, 33 S.Ct. 290, 57 L.Ed. 520 (1913)). This paramount concern for regulating solid waste has been subsequently codified by statute. *See* KRS 224.43–010 et seq.; KRS 211.350; KRS 212.230(1)(g). The present case does not enjoy such a well-established line of authority regarding the need for administrative regulation of smoking and secondhand smoke. In sum, we find limited utility in the holdings advanced by *Do* and *Haunz* and the authority upon which they rely.

We do find guidance in the reasoning of *Henry v. Parrish*, which rings as true today as it did in 1948. 307 Ky. 559, 211

S.W.2d 418 (1948). In that case, our predecessor Court held that the Jefferson County Board of Health exceeded its statutory authority to regulate when it required food establishments in Jefferson County to pay a fee. *Id.* The purpose of the fee was to defray the costs of administering the health board's regulations. *Id.*

*Parrish* recognized "that certain police powers may be, and properly should be, delegated to municipalities in order that they may carry on local self government." *Id.* at 420 (citations omitted); *see also Stephenson v. Louisville & Jefferson County Bd. of Health,* 389 S.W.2d 637 (Ky.1965) (holding that the Jefferson County Board of Health was a municipal corporation and subdivision of the state). The *Parrish* Court continued, noting that "[o]n the other hand, Sections 27 and 28 of our Kentucky Constitution forbid the delegation of legislative power to administrative boards or agencies, which are a part of the executive branch of government." *Parrish,* 211 S.W.2d at 421.

This conflict between the need for strong local authority and Kentucky's robust separation of powers provisions was further developed by the Court as follows: "An administrative body may, of course properly promulgate *subordinate* rules. But in this case, the action of the [Jefferson County Health Board] constituted the exercise of legislative power in enacting the *paramount* rule." *Id.* (emphasis added); *see also id.* at 422 (citing 42 Am.Jur., Public Administrative Law, Section 99) ("Regulations are valid only as subordinate rules and when found to be within the framework of the policy which the legislature has *sufficiently defined.*") (emphasis added).

■ Applying the facts of the present case to the dichotomy advanced in *Parrish,* we conclude that KRS 212.230(1)(c) cannot be construed as the paramount rule from which the allegedly subordinate Regulation was derived. Regarding the regulation of smoking and second-hand smoke in particular, "no specific statutory authority is given, and if any exists, it must be implied." *Parrish,* 211 S.W.2d at 421. By adopting the Regulation here, the Board impermissibly enacted a paramount rule under the guise of a subordinate regulation, therefore placing the proverbial cart in front of the horse.

We can gain further insight from our nation's highest court. In the case of *FDA v. Brown & Williamson,* the U.S. Supreme Court determined that the Food, Drug, and Cosmetic Act ("FDCA") did not authorize the Food and Drug Administration ("FDA") to regulate tobacco products. 529 U.S. at 161, 120 S.Ct. 1291. In so holding, the Court articulated the parameters of deference applied to the determinations of federal administrative agencies. *Id.* at 159–61, 120 S.Ct. 1291; *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that courts must defer to an agency's reasonable interpretation of statutes that it administers absent clear Congressional intent to the contrary). Even though applying this stringent *Chevron* standard, the Court invalidated the 1996 FDA regulations governing the promotion and labeling of tobacco products and their accessibility to children and adolescents. *Brown & Williamson,* 529 U.S. at 161, 120 S.Ct. 1291.

In a belated response to the Court's decision, Congress enacted The Family Smoking Prevention and Tobacco Control Act of 2009, which was signed into law by President Obama in June of that year. *See* 21 U.S.C. § 387 et seq. The new enactment amended the FDCA by authorizing the FDA to regulate tobacco products and specifically directed the FDA to reissue the 1996 regulations invalidated in

*Brown & Williamson.* 21 U.S.C. § 387a; 21 U.S.C. § 387a–1(a)(2). However, the new statutory amendments forbid the FDA from banning tobacco products. 21 U.S.C. § 387g(d)(3).

The substantive distinctions between *Brown & Williamson* and the present case do not foreclose analogy. At its foundation, *Brown & Williamson* further reinforces that the authority of administrative agencies to regulate tobacco products must be sufficiently grounded in legislative enactment. The Family Smoking Prevention and Tobacco Control Act of 2009 provides such an example. Its adoption in the wake of the *Brown & Williamson* decision reaffirms that, although the engine of representative democracy may be less than expeditious, it nevertheless endures and accomplishes that for which it was designed.

 We note that the Kentucky General Assembly has regulated smoking in state-owned and managed facilities, thus acknowledging that smoking is a matter of public health. *See* KRS 61.165; KRS 61.167; KRS 438.050; KRS 196.245. However, the authority granted under KRS 212.230(1)(c), even when coupled with these additional statutes, fails to provide the Board with the teeth necessary to adopt and enforce the Regulation. *Cf.* 21 U.S.C. § 387 et seq. Moreover, our analysis is strengthened by Kentucky's longstanding rule that, where reasonable doubt exists concerning the proper scope of an administrative agency's authority, it should be resolved against the agency. *See Parrish,* 211 S.W.2d at 422 (citing *Bd. of Educ. of City of Newport v. Scott,* 189 Ky. 225, 224 S.W. 680, 681 (1920)). Therefore, we conclude that there is insufficient grounding in statute for the Regulation adopted by the Board in this case.

To provide clarification, our holding does not seek to defang KRS 212.230(1)(c) or the other provisions of that Chapter. Nor is our holding intended to disturb our prior decisions in the field of public health. Yet, an increase in the aggregate power of administrative agencies over the recent decades, if left unchecked, invites the ascendance of a fourth branch of government— the regulatory state. The trustees of our state and federal constitutions must bear this burden with pragmatic resolve so that government may effectively function in the 21st century without abdicating sovereignty. The balancing of freedoms is the most delicate task of a democracy for which there is no judicial panacea. A free people vest that onerous duty to those whom they have entrusted through the elective process.

### Constitutionality and Preemption

Having determined that the Board exceeded its statutory authority, we need not address Appellants' alternative argument regarding the constitutionality of KRS 212.230(1)(c). We will briefly discuss Appellants' final argument that the field of tobacco-smoke-regulation has been preempted by the Commonwealth and its subdivisions.

 As previously noted, the General Assembly has enacted laws governing smoking. KRS 61.165; KRS 61.167; KRS 438.050; KRS 196.245. However, these laws merely regulate smoking in state-owned and managed facilities. When previously presented with this nearly identical argument, we stated that "the statutes presented are not a comprehensive system of legislation on smoking but are a collection of various statutes that mention smoking in a specific context." *Lexington Fayette County Food and Beverage Ass'n,* 131 S.W.3d at 751 (holding that smoking ban ordinance was not preempted by state law). In consideration of the subsequent

amendments to KRS 61.165, we reaffirm our previous holding.

### *Conclusion*

In sum, we hold that the Bullitt County Board of Health exceeded its authority under KRS 212.230(1)(c) in adopting Regulation No. 10–01. Bullitt County Health Board Regulation No. 10–01 is therefore invalid and unenforceable. For the foregoing reasons, we reverse the decision of the Court of Appeals and reinstate the judgment of the Bullitt Circuit Court.

MINTON, C.J.; ABRAMSON, NOBLE, VENTERS and SCOTT, JJ., concur. KELLER, J., not sitting.